1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ARCSOFT, INC.,

Plaintiff,

v.

CYBERLINK CORP., et al.,

Defendants.

Case No. 15-cv-03707-WHO

**ORDER REGARDING DEFENDANTS'
MOTION TO DISMISS THE THIRD,
FOURTH, AND SIXTH CAUSES OF
ACTION AND PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**

Re: Dkt. Nos. 10, 40, 41

## INTRODUCTION

This is a trademark infringement action involving competing self-portrait photo ("selfie") editing applications ("apps"). Plaintiff ArcSoft, Inc. ("ArcSoft") is the developer of the "Perfect365" selfie editing app. It accuses defendants Cyberlink Corp. ("CyberLink"), and its two subsidiaries, defendants Perfect Corp., a California corporation ("Perfect California"), and Perfect Corp., a Cayman Islands corporation ("Perfect Cayman Islands"), of infringing and diluting the trademarks and trade dress embodied in the Perfect365 app by, among other things, using and marketing their "YouCam Perfect" selfie editing app.

ArcSoft moves for a preliminary injunction. Defendants move to dismiss ArcSoft's causes of action for federal and state trademark dilution and for federal trade dress infringement. ArcSoft has not stated a claim for trademark dilution (because, among other reasons, it has not plausibly alleged that its marks were "famous" before defendants entered the market in February 2014) or for trade dress infringement (because it has not articulated its asserted trade dress with sufficient clarity). It has failed to establish a likelihood of irreparable harm based on its remaining causes of action for trademark infringement and unfair competition. Accordingly, defendants' motion to dismiss is GRANTED, and Arcsoft's motion for preliminary injunction is DENIED.

United States District Court
Northern District of California

# BACKGROUND

## I.     FACTUAL BACKGROUND

ArcSoft describes the Perfect365 app as a "digital makeup, personal styling, beautification, and self-portrait photo ("selfie") editing application."  Compl. ¶ 17 (Dkt. No. 1).  The app is available for iPhones and iPads, Android smartphones and tablets, and Windows phones and personal computers.  *Id.*

ArcSoft first used the Perfect365 mark "at least as early as November 2, 2011" and has used it continuously since that date.  *Id.* ¶ 19.  It filed an intent-to-use application with the United States Patent and Trademark Office ("PTO") for the standard character Perfect365 mark on August 24, 2011 and registered the mark on July 3, 2012.  *Id.* ¶ 20.  On December 7, 2011, Arcsoft also filed an application with the PTO for a design mark consisting of the wording "Perfect365" and the image of a human face.  On April 10, 2012, it registered the design mark.  *Id.* ¶ 21.  ArcSoft refers to the standard character Perfect 365 mark and the Perfect 365 design mark collectively as the "Perfect 365 Mark."  *Id.* ¶ 23.

Arcsoft states that over 60 million consumers have downloaded the Perfect365 App globally, and that 20 million have done so nationally.  *Id.* ¶ 24.  It alleges that

> by virtue of [its] extensive and continuous use, promotion, and registration of the Perfect365 Mark in connection with its goods and services, ArcSoft has established significant acquired distinctiveness and goodwill in the Perfect365 Mark. On information and belief, a significant portion of consumers readily identify the mark and the term "Perfect" with ArcSoft and its high quality selfie editing app and imaging software goods and services.

> [ . . . ]

> ArcSoft's extraordinary success has resulted from not only the quality of its goods and services (the Perfect365 app has received user reviews averaging over four out of five stars among the thousands of total reviews posted), but also from the strength of its well-known brand developed in connection with its goods and services as ArcSoft has expended considerable time, effort, and money in advertising and promoting its Perfect365 Mark.

> ArcSoft has attained widespread and favorable recognition of its Perfect365 Mark throughout the United States.  ArcSoft advertises, markets, promotes, offers, and provides the Perfect365 app to consumers throughout the geographic extent of the United States, and through multiple platforms, including the Apple App Store,

United States District Court
Northern District of California

Google Play app store, Microsoft Store for Windows phone and desktop apps, Facebook, Twitter, and Instagram . . .

Additionally, on information and belief, the Perfect365 app counts many of the United States' and world's most famous celebrities among its dedicated users. The famous Kardashian family, including Kim Kardashian, Kendall Jenner, and Kylie Jenner (perhaps the world's foremost authorities on the selfie), reportedly use the Perfect365 app to edit their widely-consumed selfies. On information and belief, this use by such world famous celebrities has dramatically amplified the already high general consumer recognition of the Perfect365 Mark and app.

On account of the wide extent of use by the general consuming public of the Perfect365 app, the use by world famous celebrities of the app, and the high quality of the app itself, ArcSoft's Perfect365 app has also been recognized and featured in many of the most famous and widely-circulated publications in the United States. The Perfect365 app has been featured, and its virtues extolled, in such publications as The New York Times, The Washington Post, The Huffington Post, The Daily Mail, Allure magazine, TechCrunch, PCWorld, and VentureBeat. On information and belief, such articles featuring, recognizing, and mentioning the Perfect365 app are indicative of and have further amplified the widespread recognition of the Perfect365 Mark by United States consumers generally. Thus, the Perfect365 Mark is famous amongst the general consuming public of the United States.

*Id.* ¶¶ 24-25 (paragraphs added).

In addition to the Perfect 365 Mark, ArcSoft claims that it "owns distinctive and nonfunctional trade dress in the look and design of its Perfect 365 app." *Id.* ¶ 26. It identifies the following elements of its claimed trade dress:

• [A] distinctive purple color scheme, which is featured throughout the app, including without limitation on the app home screen, load screens within the app, and screens within the app for taking and editing selfies.

• This distinctive purple color scheme is also reflected in the unique app icon for the Perfect365 app, which is also a key element of ArcSoft's trade dress. The app icon is predominantly a deep purple color, with different shades of purple at the edges, and features a prominent flower design and human face design in color white. The wording "Perfect365" appears at the bottom of the app icon when the app is downloaded to a smart device.

• ArcSoft's Perfect365 Mark is also a critical feature of ArcSoft's trade dress. The mark is displayed on the app icon, the app load page in color purple, and on screens within the app including without limitation the app home screen.

• One of the key features of the Perfect365 app itself and trade dress associated therewith is the distinctive (in function and form) photo-

taking feature, which utilizes the smart device's camera within the app to enable the user to easily take and edit selfies all within the confines of the app. The Perfect365 app's photo-taking function features a circular shutter button at the bottom of the screen comprised of an inner white circle surrounded by distinctive circular bands in ArcSoft's purple.

• Another key feature of ArcSoft's Perfect365 app and associated trade dress is the photo-editing and beautification function of the Perfect365 app. This function features, inter alia, icons reflecting selfie editing options (e.g., for editing "Blemishes," "Blush," and eye features) at the bottom of screen in ArcSoft's distinctive purple when selected, over a white rectangular band.

*Id.* ArcSoft refers to these elements as the "Perfect365 Trade Dress" and states that they "consist strictly of ArcSoft's trademarks and the aesthetic design of the Perfect365 app, and do not contribute to or improve the functionality of the app or affect the cost or quality of the app. ArcSoft has not advertised the utilitarian advantage of its app design, and there are an infinite number of available alternative commercially feasible designs for similarly functioned apps for selfie and photo editing and beautification." *Id.* ¶ 28. It further alleges that the Perfect365 Trade Dress is "inherently distinctive" and has "acquired distinctiveness in the minds of consumers." *Id.* ¶ 27. "Thus, on information and belief, a significant portion of consumers and persons within the relevant industry associate and understand the Perfect365 Trade Dress as an indicator of source of [the Perfect365 app]." *Id.*

The complaint brings seven causes of action against defendants: (1) federal trademark infringement under 15 U.S.C. § 1114; (2) federal unfair competition under 15 U.S.C. § 1125(a); (3) federal trade dress infringement under 15 U.S.C. § 1125(a); (4) federal trademark dilution under 15 U.S.C § 1125(c); (5) state common law trademark infringement under California law; (6) state trademark dilution under California Business & Professions Code § 14247; and (7) unfair competition under California Business & Professions Code § 17200. *Id.* ¶¶ 54-95.

ArcSoft's claims against defendants relate to their use of (1) the federally registered mark "YouPerfect;"[1] (2) the mark "YouCam Perfect" and the YouCam Perfect app; and (3) the mark

---

[1] The complaint states that CyberLink filed an intent-to-use application with the PTO on the YouPerfect mark on November 20, 2013 and registered it on March 31, 2015. Compl. ¶¶ 31-32.

United States District Court
Northern District of California

1    "PERFECT," on which Perfect Cayman Islands has filed two pending trademark applications.[2]  *Id.*

2    ¶¶ 31-42.  The complaint refers to the YouPerfect, YouCam Perfect, and PERFECT marks

3    collectively as the "Infringing Marks," and to the Perfect 365 Trade Dress "as used in connection

4    with the YouCam Perfect app" as the "Infringing Trade Dress."  *Id.* ¶¶ 41-42.  The earliest alleged

5    use in commerce of the YouPerfect mark is on February 20, 2014.  *Id.* ¶ 31.  The earliest alleged

6    use in commerce of the YouCam Perfect mark and YouCam Perfect app is in April 2014.  *Id.* ¶ 35.

7    The earliest alleged use in commerce of the PERFECT mark is on February 2, 2015.  *Id.* ¶ 36.

8    ## II.    PROCEDURAL BACKGROUND

9         ArcSoft filed its complaint on August 13, 2015 and its motion for preliminary injunction

10   on September 1, 2015.  Dkt. Nos. 1, 10.  It seeks a preliminary injunction prohibiting defendants

11   and various affiliated entities from

12   > (1)  manufacturing, producing, sourcing, importing, selling,
13   > offering for sale, distributing, advertising, providing, marketing or
     > otherwise promoting any goods or services in connection with or
14   > under any mark, word, term, name, symbol, device, or combination
     > thereof, or other designation or trade dress, that so resembles
15   > ArcSoft's registered Perfect365 trademark or related trade dress as
     > to be likely to cause confusion, mistake, or deception amongst
16   > consumers; and (2) using any mark, word, term, name, symbol,
     > device, or combination thereof, or other designation or trade dress,
17   > that causes or is likely to cause dilution by blurring the
     > distinctiveness of ArcSoft's Perfect365® mark, or that causes or is
18   > likely to cause confusion, mistake, or deception with ArcSoft's
     > Perfect365 mark or related trade dress or as to the affiliation,
19   > association, or origination of Defendants or their goods or services
     > with ArcSoft or its Perfect365 mark or related trade dress or goods
     > or services thereunder.

20   Mot. for Prelim. Inj. at 2 (Dkt. No. 10).  On November 10, 2015, defendants moved to dismiss

21   ArcSoft's third, fourth and sixth causes of action, for federal and state trademark dilution and for

22   federal trade dress infringement.  Dkt. No. 40.  I heard argument from the parties on both motions

23   on December 16, 2015.  Dkt. No. 57.

---

[2] The complaint states that Perfect Cayman Islands filed an application with the PTO on the standard character mark "PERFECT" on May 15, 2015, and another application on a design mark on the wording "PERFECT" combined with a particular design on May 22, 2015.  Compl. ¶¶ 37-38.

United States District Court
Northern District of California

# LEGAL STANDARD

## I.   MOTION TO DISMISS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted).  "[I]t is within [the court's] wheelhouse to reject, as implausible, allegations that are too speculative to warrant further factual development."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

## II.   MOTION FOR PRELIMINARY INJUNCTION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v.*

United States District Court
Northern District of California

*Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, if the plaintiff cannot establish that it is likely to succeed on the merits, it may still obtain an injunction if it shows that it has raised "serious questions going to the merits" and that the balance of hardships "tips sharply" in its favor, so long as it also shows that the other two *Winter* factors are satisfied, i.e., that there is a likelihood of irreparable injury and that the injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011); *accord Angelotti Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1081 (9th Cir. 2015).

## DISCUSSION

## I. DEFENDANTS' MOTION TO DISMISS

Defendants move to dismiss the fourth and sixth causes of action for federal and state trademark dilution under 15 U.S.C § 1125(c) and California Business & Professions Code § 14247, and the third cause of action for federal trade dress infringement under 15 U.S.C. § 1125(a). Mot. to Dismiss at 1 (Dkt. No. 40). For the reasons discussed below, the motion is GRANTED.

### A. Fourth and Sixth Causes of Action: Trademark Dilution

The parties agree that the analysis is the same for a trademark dilution claim whether under federal or California law. *See* Mot. to Dismiss at 5; Opp. to Mot. to Dismiss at 12 (Dkt. No. 49); *see also Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008). To prevail on a dilution claim, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys*, 518 F.3d at 634.

Defendants contend that ArcSoft has not adequately alleged that the Perfect365 Mark is famous. A mark qualifies as famous for the purposes of a dilution claim "if it is widely

United States District Court
Northern District of California

1  recognized by the general consuming public of the United States as a designation of source of the

2  goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2).  The mark must have acquired

3  the requisite level of fame by the time "the defendant first began to use the mark in commerce."

4  *Pinterest, Inc. v. Pintrips, Inc.*, No. 13-cv-04608-HSG, 2015 WL 6167967, at *21 (N.D. Cal. Oct.

5  21, 2015); *see also Clearly Food & Beverage Co. v. Top Shelf Beverages, Inc.*, 2015 WL

6  1926503, at *16-17 (W.D. Wash. 2015)*; Parts.com, LLC v. Yahoo! Inc.*, 996 F. Supp. 2d 933, 940

7  (S.D. Cal. 2013).  "In determining whether a mark possesses the requisite degree of recognition,

8  the court may consider all relevant factors, including the following:  (i) The duration, extent, and

9  geographic reach of advertising and publicity of the mark, whether advertised or publicized by the

10  owner or third parties.  (ii) The amount, volume, and geographic extent of sales of goods or

11  services offered under the mark.  (iii) The extent of actual recognition of the mark.  (iv) Whether

12  the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on

13  the principal register." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

14    Applying these provisions, the Ninth Circuit has concluded that trademark dilution "is a

15  cause of action reserved for a select class of marks – those marks with such powerful consumer

16  associations that even noncompeting uses can impinge on their value." *Nissan Motor Co. v.*

17  *Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004) (internal quotation marks omitted).

18  "[D]ilution protection [extends] only to those whose mark is a household name." *Id.* (internal

19  quotation marks omitted).  Courts have described dilution fame as "a rigorous standard," *Everest*

20  *Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 763 (8th Cir. 2005), "a difficult and

21  demanding requirement," *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-cv-

22  04050-MEJ, 2014 WL 6788310, at *20 (N.D. Cal. Dec. 2, 2014) (internal quotation marks

23  omitted), and "difficult to prove," *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356,

24  1373 (Fed. Cir. 2012).

25    In defending its allegations of dilution fame, ArcSoft points to paragraphs 24 and 25 of its

26  complaint.  Opp. to Mot. to Dismiss at 13-14.  There, Arcsoft states that over 60 million

27  consumers have downloaded the Perfect365 App globally, that 20 million have done so nationally,

28  and that "[o]n information and belief, a significant portion of consumers readily identify the

United States District Court
Northern District of California

[Perfect365 Mark] and the term 'Perfect' with ArcSoft and its high quality selfie editing app and imaging software goods and services." Compl. ¶ 24. ArcSoft further alleges that it "has attained widespread and favorable recognition of its Perfect365 Mark throughout the United States." *Id.* ¶ 25. It states that it has done so by advertising, marketing, promoting, offering, and providing the Perfect365 app through multiple electronic platforms and websites and "throughout the geographic extent of the United States." *Id.* ArcSoft also states that the Perfect365 app "counts many of the United States' and world's most famous celebrities among its dedicated users" – specifically, the Kardashians – and that the app has been featured, recognized, and/or mentioned in "many of the most famous and widely-circulated publications in the United States" – specifically, The New York Times, The Washington Post, The Huffington Post, The Daily Mail, Allure magazine, TechCrunch, PCWorld, and VentureBeat. *Id.* ArcSoft also points out that the standard character mark and the design mark that comprise the Perfect365 Mark are both registered with the PTO. *See* Opp. to Mot. to Dismiss at 14; Compl. ¶¶ 20-21.

These allegations are not sufficient to show that the Perfect365 Mark is famous within the meaning of 15 U.S.C. § 1125(c)(2). While the fourth of the 15 U.S.C. § 1125(c)(2)(A) factors (regarding registration of the mark) favors ArcSoft, the rest weigh heavily in favor of defendants. *See Parts.com*, 996 F. Supp. 2d at 940-41 (dismissing federal trademark dilution claim where the plaintiff's mark was registered but the plaintiff's "allegations regarding th[e] [other] three factors are conclusory and do not provide sufficient specific facts to be plausible").

First, with respect to the "duration, extent, and geographic reach of advertising and publicity of the mark," 15 U.S.C. § (c)(2)(A)(i), ArcSoft states that it began using the Perfect365 Mark on November 2, 2011. Compl. ¶ 19. Defendants began using the Infringing Marks on February 20, 2014.[3] Thus, to prevail on its dilution claims, ArcSoft must show that the Perfect365 Mark acquired dilution fame in the approximately 28 months that passed between November 2, 2011 and February 20, 2014. ArcSoft highlights its allegations that it has advertised the Perfect365 app through multiple electronic platforms and "throughout the geographic extent of the

---

[3] ArcSoft does not distinguish between the Infringing Marks, or their respective first dates of use in commerce, for the purposes of its dilution claims.

United States District Court
Northern District of California

1   United States," that "many of the United States' and world's most famous celebrities" use the app,

2   and that "many of the most famous and widely-circulated publications in the United States" have

3   featured, recognized, and/or mentioned the app. *See* Opp. to Mot. to Dismiss at 13-14; Compl. ¶

4   25. Crucially, however, ArcSoft does not allege when any of these things occurred – i.e., before

5   or after February 2014. Nor does it allege any details regarding its advertising or promoting of the

6   Perfect365 Mark, or the particular contexts in which the Perfect365 Mark appeared in the various

7   publications. *See Parts.com*, 996 F. Supp. 2d at 940 (finding that the first factor weighed against

8   the plaintiff where the complaint alleged that "since at least January 2000 [plaintiff] has expended

9   a significant amount of resources in developing goodwill and brand recognition in and for [its]

10  mark," but there were "no specific allegations of online promotions, advertising campaigns, or

11  presence in trade publications").

12        Second, with respect to the "amount, volume, and geographic extent of sales of goods or

13  services offered under the mark," 15 U.S.C. § (c)(2)(A)(ii), ArcSoft points to the alleged 20

14  million United States downloads of the Perfect365 App. *See* Opp. to Mot. to Dismiss at 13-14;

15  Compl. ¶ 24. ArcSoft identifies no other relevant allegations for this factor. Even assuming that

16  20 million downloads standing alone could be enough to tip the second factor in ArcSoft's favor,

17  ArcSoft again fails to allege how many of these downloads occurred before versus after February

18  2014. In any event, ArcSoft cites no authority for the proposition that 20 million downloads of an

19  app is a material indicator of "household name" status. Indeed, following a recent bench trial, the

20  Hon. Haywood S. Gilliam, Jr. held that Pinterest Inc. had failed to establish dilution fame, despite

21  evidence that at the relevant time the Pinterest website received 25 million monthly active users.

22  *See Pinterest*, 2015 WL 6167967, at *22-24.

23        Finally, with respect to the "extent of actual recognition of the mark," 15 U.S.C. §

24  (c)(2)(A)(iii), ArcSoft does not offer any nonconclusory allegations about the extent to which

25  consumers actually recognize the Perfect365 Mark. ArcSoft simply alleges that it is a "well-

26  known brand," that "[o]n information and belief, a significant portion of consumers readily

27  identify the [Perfect365 Mark]," and that it "has attained widespread and favorable recognition of

28  its Perfect365 Mark throughout the United States." *Id.* ¶¶ 24-25. For the reasons discussed above,

10

United States District Court
Northern District of California

1    the various allegations stated in support of these claims do not give rise to a plausible inference

2    that by February 2014 the Perfect365 Mark was actually recognized by any significant segment of

3    the United States population.

4          Given the high burden that a plaintiff faces in establishing that its mark is sufficiently

5    famous to support a dilution claim, ArcSoft must plead more than conclusory assertions of fame to

6    survive a motion to dismiss: it must plead facts that support a plausible inference that its mark

7    qualified as a household name by February 2014 (or whatever date is alleged as defendants' first

8    use of the Infringing Marks).  Because Arcsoft has not done so, the motion to dismiss the fourth

9    and sixth causes of action for trademark dilution is GRANTED WITH LEAVE TO AMEND.

10          **B.        Third Cause of Action: Trade Dress Infringement**

11          Trade dress refers to "a combination of any elements in which a product is presented to a

12    buyer, including the shape and design of a product."  *Art Attacks Ink, LLC v. MGA Entm't Inc.*,

13    581 F.3d 1138, 1145 (9th Cir. 2009); *see also Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127

14    F.3d 821, 828 (9th Cir. 1997) ("Trade dress is the totality of elements in which a product or

15    service is packaged or presented.") (internal quotation marks omitted).  "To prove trade dress

16    infringement, a plaintiff must demonstrate that (1) the trade dress is nonfunctional, (2) the trade

17    dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion

18    between the plaintiff's and defendant's products."  *Art Attacks*, 581 F.3d at 1257.

19          Defendants move to dismiss the trade dress infringement cause of action on the ground that

20    ArcSoft has not adequately alleged that the Perfect365 Trade Dress is nonfunctional.  Mot. to

21    Dismiss at 11-14; Reply ISO Mot. to Dismiss at 12-15 (Dkt. No. 50).  The nonfunctionality

22    requirement of trade dress protection, codified at 15 U.S.C. § 1125(a)(3),[4] "is based on the judicial

23    theory that there exists a fundamental right to compete through imitation of a competitor's

24    product, which right can only be temporarily denied by the patent or copyright laws."  *Tie Tech,*

25    *Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) (internal quotation marks and emphasis

26

27    ──────────────────

28    [4] "In a civil action for trade dress infringement under this chapter for trade dress not registered on
      the principal register, the person who asserts trade dress protection has the burden of proving that
      the matter sought to be protected is not functional."  15 U.S.C. § 1125(a)(3).

United States District Court
Northern District of California

omitted).  The doctrine recognizes the distinction between, on the one hand, "a customer's preference for a particular functional aspect of a product," and, on the other hand, "a customer's desire to be assured that a particular entity made, sponsored, or endorsed a product."  *Id.* at 786-87.  "Whereas the latter concern encompasses the realm of trademark protection, the former does not."  *Id.* at 787.  In other words, the doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."  *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995).  "It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation.  If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify [for patent protection]."  *Id.* at 164-65 (internal citations omitted).

"A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage."  *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (internal quotation marks omitted); *see also Apple Inc. v. Samsung Elecs. Co.*, 786 F.3d 983, 991 (Fed. Cir. 2015) (applying Ninth Circuit law and observing that "[a] trade dress, taken as a whole, is functional if it is in its particular shape because it works better in this shape") (internal quotation marks and emphasis omitted).  To determine whether a claimed trade dress is functional, the Ninth Circuit considers several factors: "(1) whether the design yields a utilitarian advantage,[5] (2) whether alternative designs are available,[6] (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."

---

[5] *See Disc Golf*, 158 F.3d at 1007 ("A product feature need only have *some* utilitarian advantage to be considered functional.") (emphasis in original).

[6] *See Secalt*, 668 F.3d at 686 (finding a "a lack of alternative designs" where the evidence showed that "even though many of the [competitor's products] likely are highly functional and useful, none of them offer exactly the same features as [plaintiff's product]") (internal quotation marks, emphasis, and alterations omitted).

*Id.* (footnotes added).

In applying these factors and evaluating functionality, "it is crucial that [the court] focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001) (emphasis omitted). The claimed trade dress "must be examined as a whole, not by its individual constituent parts." *Id.* That said, "[w]here the plaintiff only offers evidence that the whole is nothing other than the assemblage of functional parts, . . . it is semantic trickery to say that there is still some sort of separate overall appearance which is nonfunctional." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002); *accord Apple*, 786 F.3d at 995-96; *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 683 (9th Cir. 2012).

Under 15 U.S.C. § 1125(a)(3), the burden is on the plaintiff to establish nonfunctionality. *See* 15 U.S.C. § 1125(a)(3); *see also Secalt*, 668 F.3d at 683 (noting that 15 U.S.C. § 1125(a)(3) "imposes a presumption of functionality"). Thus, to prevail on its trade dress infringement claim, ArcSoft, "as the one who seeks to establish trade dress protection, must carry the heavy burden of showing that the [claimed trade dress] is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Secalt*, 668 F.3d at 683 (internal quotation marks omitted).

As stated above, ArcSoft alleges in its complaint that the Perfect 365 Trade Dress is comprised of the following elements:

> • [A] distinctive purple color scheme, which is featured throughout the app, including without limitation on the app home screen, load screens within the app, and screens within the app for taking and editing selfies.
>
> • This distinctive purple color scheme is also reflected in the unique app icon for the Perfect365 App, which is also a key element of ArcSoft's trade dress. The app icon is predominantly a deep purple color, with different shades of purple at the edges, and features a prominent flower design and human face design in color white. The wording "Perfect365" appears at the bottom of the app icon when the app is downloaded to a smart device.
>
> • ArcSoft's Perfect365 Mark is also a critical feature of ArcSoft's trade dress. The mark is displayed on the app icon, the app load page in color purple, and on screens within the app including without limitation the app home screen.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

• One of the key features of the Perfect365 App itself and trade dress associated therewith is the distinctive (in function and form) photo-taking function, which utilizes the smart device's camera within the app to enable the user to easily take and edit selfies all within the confines of the app. The Perfect365 App's photo-taking function features a circular shutter button at the bottom of the screen comprised of an inner white circle surrounded by distinctive circular bands in ArcSoft's purple.

• Another key feature of ArcSoft's Perfect365 App and associated trade dress is the photo-editing and beautification function of the Perfect365 App. This function features, inter alia, icons reflecting selfie editing options . . . at the bottom of [the] screen in ArcSoft's distinctive purple when selected, over a white rectangular band.

Compl. ¶ 26.  Apparently realizing that it had included multiple explicitly functional features in its claimed trade dress, ArcSoft retreats from much of this language in its opposition brief, instead focusing on the following aspects of the Perfect365 app: (1) "a distinctive purple color scheme," (2) "a unique app icon for the Perfect365 app," (3) the "Perfect365 Mark itself," (4) "a circular shutter button at the bottom of the screen comprised of an inner white circle surrounded by distinctive circular bands in ArcSoft's purple," and (5) the "icons reflecting selfie editing options . . . at the bottom of [the] screen in ArcSoft's distinctive purple when selected, over a white rectangular band."  Opp. to Mot. to Dismiss at 6.  Elsewhere in its opposition brief, ArcSoft appears to narrow its claimed trade dress even further, to "how the shutter button [and] [selfie editing] icons look."  *See, e.g., id.*

While functionality "is generally viewed as an intensely factual issue," *Tie Tech*, 296 F.3d at 783, courts in this circuit have required trade dress plaintiffs, at the very least, to provide adequate notice by including in their complaint "a complete recitation of the concrete elements of [their] alleged trade dress."  *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230, 1240 (C.D. Cal. 2014); *see also Bryant v. Matvieshen*, 904 F. Supp. 2d 1034, 1046 (E.D. Cal. 2012) ("In order to state a trade dress claim for website design, [plaintiff] needs to clearly define the specific elements that constitute the trade dress; a general description of the site is insufficient."); *Salt Optics, Inc. v. Jand, Inc.*, No. 10-cv-00828, 2010 WL 4961702, at *4 (C.D. Cal. Nov. 19, 2010) ("A plaintiff must clearly articulate its claimed trade dress to give a defendant sufficient notice."); *Sleep Sci. Partners v. Lieberman*, No. 09-cv-04200-CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010)

1    (same); *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, No. 08-cv-04397-WHA, 2008 WL

2    6742224, at *5 (N.D. Cal. Dec. 18, 2008) ("[Plaintiff] must provide more detail and clarify . . . the

3    trade dress at issue.  The complaint does not sufficiently put [defendant] on notice of the trade

4    dress claim alleged.").  Arcsoft's "shifting-sands approach" to defining the Perfect365 Trade Dress

5    does not comply with this requirement.  *Lepton Labs*, 55 F. Supp. 3d at 1240.  At the very least,

6    ArcSoft must specifically identify, in its complaint, the particular aspects of the Perfect365 app

7    that it claims amount to the protectable trade dress that defendants have infringed.  I read

8    ArcSoft's opposition brief as a concession that the trade dress currently described in its complaint

9    is not the one it means to assert against defendants.  For this reason, the motion to dismiss the third

10   cause of action for trade dress infringement is GRANTED WITH LEAVE TO AMEND.

## II.    ARCSOFT'S MOTION FOR PRELIMINARY INJUNCTION

12        Because its allegations regarding trademark dilution and trade dress infringement fail to

13   state a claim, ArcSoft must rely on its trademark infringement and unfair competition causes of

14   action for its preliminary injunction request.  *See, e.g., Doe v. Fed. Dist. Court*, 467 F. Appx. 725,

15   728 (9th Cir. 2012) ("Because Doe's complaint was insufficient to survive a motion to dismiss for

16   failure to state a claim, she could not show a strong likelihood of success on the merits."); *Boyd v.*

17   *GMAC Mortgage LLC*, No. 11-cv-05018-PSG, 2011 WL 6025906, at *5 (N.D. Cal. Dec. 5, 2011)

18   ("[Plaintiff] has not demonstrated a likelihood of success on the merits or even serious questions

19   going to the merits, because [plaintiff] has failed to state a claim for relief under Fed. R. Civ. P.

20   8.").[7]  ArcSoft characterizes each of these causes of action as requiring it to prove the same two

21   elements: (1) ownership of a valid trademark; and (2) use by defendants in commerce of a mark

22   likely to cause confusion with the valid trademark.  *See, e.g.,* Mot. for Prelim. Inj. at 12-13.  For

23   the following reasons, I find that irrespective of the merits of these causes of action, ArcSoft is not

---

[7] Even if I were to ignore the pleading deficiencies in ArcSoft's trademark dilution and trade dress infringement claims, I would still find that there is neither a likelihood of success nor serious questions going to the merits with respect to those claims.  Given the high bar to establishing dilution fame under 15 U.S.C. § 1125(c)(2) and the allegations and evidence submitted thus far, I find it highly unlikely that ArcSoft will be able to satisfy this threshold requirement.  Likewise, ArcSoft's chances of establishing each element required for its trade dress infringement cause of action – i.e., nonfunctionality, secondary meaning, and substantial likelihood of confusion – appear extremely low based on the current record.

United States District Court
Northern District of California

1    entitled to a preliminary injunction because it has not shown that it is likely to suffer irreparable

2    harm as a result of defendants' use of the Infringing Marks.  *See Williams v. Green Valley RV,*

3    *Inc.*, No. 15-cv-01010, 2015 WL 4694075, at *2 (C.D. Cal. Aug. 6, 2015) (denying motion for

4    preliminary injunction based only on movant's failure to establish a likelihood of irreparable

5    harm); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine*

6    *Fisheries Serv.*, No. 13-cv-03717-NC, 2015 WL 3466314, at *8-9 (N.D. Cal. May 29, 2015)

7    (same); *XimpleWare Corp. v. Versata Software, Inc.*, No. 13-cv-05160-SI, 2013 WL 6405979, at

8    *3 (N.D. Cal. Dec. 6, 2013) (same, with respect to application for temporary restraining order).

9        "Irreparable harm is traditionally defined as harm for which there is no adequate legal

10   remedy."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  "[E]conomic

11   injury alone does not support a finding of irreparable harm, because such injury can be remedied

12   by a damage award."  *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d

13   597, 603 (9th Cir. 1991).  The mere "possibility" of irreparable harm is not enough to justify a

14   preliminary injunction.  As the Supreme Court made clear in *Winter*, "[i]ssuing a preliminary

15   injunction based only on a possibility of irreparable harm is inconsistent with our characterization

16   of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing

17   that the plaintiff is entitled to such relief." 555 U.S. at 22; *see also Alliance*, 632 F.3d at 1131

18   ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order

19   to obtain a preliminary injunction.") (emphasis omitted).  The threat of irreparable harm must also

20   be "immediate" to warrant preliminary injunctive relief.  *Caribbean Marine Servs. Co. v.*

21   *Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "Speculative injury cannot be the basis for a finding

22   of irreparable harm."  *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007).

23       In *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir.

24   2013), the Ninth Circuit held that these basic principles of irreparable harm apply with equal force

25   in the trademark infringement context.  It stated, "Gone are the days when once the plaintiff in [a

26   trademark] infringement action has established a likelihood of confusion, it is ordinarily presumed

27   that the plaintiff will suffer irreparable harm if injunctive relief does not issue."  *Id.* at 1250

28   (internal quotation marks and alterations omitted).  The district court in *Herb Reed* had examined

16

United States District Court
Northern District of California

1    the plaintiff's showing of irreparable harm "in its own right," as opposed to presuming irreparable

2    harm, but the Ninth Circuit still reversed, finding that the district court had "abused its discretion

3    by relying on unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer."

4    *Id.* at 1249-50 (emphasis in original).  The Ninth Circuit recognized that "[e]vidence of loss of

5    control over business reputation and damage to goodwill could constitute irreparable harm."  *Id.* at

6    1250.  However, it held that the risk of such harm must be established by specifically relevant

7    evidence, not by "platitudes" or evidence that merely "underscores customer confusion."  *Id.*

8        Since *Herb Reed*, courts in this circuit have rejected claims of irreparable harm in

9    trademark infringement actions when supported only by the sort of conclusory assertions found

10   insufficient by the Ninth Circuit.  *See, e.g., Williams*, 2015 WL 4694075, at *2 ("Plaintiff's

11   evidence of irreparable harm is nothing more than a regurgitation of consumer confusion evidence,

12   which is the *exact* type of evidence explicitly rejected by the Ninth Circuit in *Herb Reed*.  Plaintiff

13   relies on only consumer confusion evidence and wants the Court to believe that he *might* suffer

14   damage to his reputation or goodwill.") (emphasis in original); *Wells Fargo & Co. v. ABD Ins. &*

15   *Fin. Servs., Inc.*, No. 12-cv-03856 PJH, 2014 WL 4312021, at *10 (N.D. Cal. Aug. 28, 2014) ("A

16   plaintiff in a trademark infringement case cannot obtain an injunction simply by showing a

17   likelihood of success on the merits of its claim, and then asserting (without evidence) that the

18   alleged infringement 'devalues' and 'taints' the mark.  If the court were to find irreparable harm

19   based on those conclusory assertions, it would collapse the likelihood of success and the

20   irreparable harm factors, and would have the practical effect of reinserting the presumption of

21   irreparable harm that was rejected in *Herb Reed*.") (internal quotation marks and alterations

22   omitted); *Sleash, LLC v. One Pet Planet, LLC*, No. 14-cv-00863, 2014 WL 4059163, at *7 (D. Or.

23   Aug. 15, 2014) ("Rather than providing any such evidence, [plaintiff] argues that such irreparable

24   harm automatically flows from the loss of control of its business and trademark.  This argument,

25   however, is inconsistent with *Herb Reed*, as the Court cannot rely on conclusory assertions

26   unsupported by evidence."); *Purdum v. Wolfe*, No. 13-cv-04816 DMR, 2014 WL 171546, at *9

27   (N.D. Cal. Jan. 15, 2014) ("While evidence of loss of control over business reputation and damage

28   to goodwill *could* constitute irreparable harm, a plaintiff must establish such likelihood *with*

*evidence*.") (internal quotation marks and alterations omitted; emphasis in original).

ArcSoft's showing of irreparable harm in its opening brief was clearly insufficient under *Herb Reed*. Its argument in support of irreparable harm consisted of the following statements, none of which was followed by any citation to evidence:

> ArcSoft has already suffered significant irreparable harm, and is likely to suffer further irreparable harm if defendants are not enjoined, in the form of loss of goodwill, reputation, positive consumer recognition, and distinctiveness in its Perfect365 Mark and Trade Dress.
>
> [ . . . ]
>
> The injury already suffered and likely to be further suffered by ArcSoft as a result of defendants' infringing activities is clear. ArcSoft is losing substantial goodwill in its Perfect365 Mark and Trade Dress due to defendants' use of the confusingly similar Infringing Marks and Trade Dress in connection with goods identical to ArcSoft's goods. Defendants' actions have already caused numerous instances of actual confusion, and on account of the prevalence of such instances of confusion, additional actual consumer confusion will be suffered on an ongoing basis. Defendants' use of the Infringing Marks and Trade Dress can only result in further instances of actual consumer confusion and loss by ArcSoft of goodwill and recognition in its mark and trade dress. This loss to ArcSoft's goodwill, reputation, and recognition is simply incalculable. ArcSoft's success in its Perfect365 App depends on a broad and loyal user base – as defendants unlawful actions cause actual confusion in the marketplace, ArcSoft suffers negative commercial perception of its Perfect365 App, loss of goodwill, and loss of customers. ArcSoft has no adequate remedy at law to the harm it is suffering, and is accordingly entitled to an injunction restraining defendants' unlawful actions.

Mot. for Prelim. Inj. at 21-22 (internal case citations omitted).

In their opposition brief, defendants argued, correctly, that ArcSoft had failed to produce actual evidence of likelihood of irreparable harm, and that its purported evidence of irreparable harm was "'nothing more than a regurgitation of consumer confusion evidence, which is the *exact* type of evidence explicitly rejected by the Ninth Circuit in *Herb Reed*.'" Opp. to Mot. for Prelim.

United States District Court
Northern District of California

Inj. at 23-24 (quoting *Williams*, 2015 WL 4694075, at *2).[8]

ArcSoft replied with an additional declaration (from Carol Leung, ArcSoft's Legal

Counsel) regarding irreparable harm and an argument that the record now establishes that it "has

suffered decreased and diverted customers/users, and attendant loss of goodwill and ability to

control its business reputation, as a result of defendants' infringing activities."  Reply ISO Mot.

for Prelim. Inj. at 13 (Dkt. No. 51).  In support of this claim, ArcSoft points to excerpts from two

declarations: (1) the declaration of Vincent Hsu, ArcSoft's Director of Business and Development;

and (2) the declaration of Carol Leung submitted in conjunction with ArcSoft's reply brief.  *See*

*id.* at 12-13.  The relevant portion of the Hsu declaration states that "[o]n information and belief,

the YouCam Perfect app has . . . caused ArcSoft to lose business associated with its Perfect365

app, including loss of downloads and users, and loss of [advertising] sales."  Hsu Decl. ¶ 15 (Dkt.

No. 12).  The relevant portion of the Leung declaration states as follows:

> 3. [S]ince around the start of 2015, we have noticed that the total
> number of users of the Perfect365 app has materially decreased.
> Overall, we have about one-third fewer users of the Perfect365 app
> compared with 2014 numbers. We have also observed that [Perfect
> California] was organized as a California corporation around
> February 2015. Following its formation, we have noticed that
> [Perfect California] has engaged in increasingly aggressive efforts to
> promote the competing YouCam Perfect selfie editing app, both

---

[8] ArcSoft's motion for preliminary injunction  references one incident that provides some, but not
much, support for its claim of loss of goodwill.  In a declaration submitted in conjunction with the
motion, Vickie Wei, ArcSoft's Director of Corporate Marketing, states that

> On August 4, 2015, a user going by the username "Rosiella
> ShadowsHeart" posted a one-star review of ArcSoft's Perfect365
> app, stating "they stole the whole ui and all from You Cam
> Makeup." This consumer was obviously confused and deceived as
> she believed the aesthetic design and user interface of the YouCam
> Makeup app was so similar to the design and interface of the
> Perfect365 app that she believed ArcSoft had copied Perfect Corp.
> and CyberLink.

Wei Decl. ¶ 5, Ex. D (Dkt. Nos. 15, 15-4) (internal alterations omitted).  While this evidence is on
the right track, it falls short of establishing a threat of irreparable loss of goodwill flowing from
defendants' alleged trademark infringement and unfair competition for at least two reasons.  First,
in referencing "the whole ui and all," the review appears to go to defendants' alleged trade dress
infringement, not their alleged trademark infringement and unfair competition.  Second,  the
review, which consists of a single, somewhat ambiguous sentence by an anonymous internet user,
is of minimal probative value even when viewed under the relaxed evidentiary standard applicable
to this motion.

online, including on their website perfectcorp.com, and at tradeshows we attended, including the BeautyCon LA beauty products tradeshow held in July 2015.

4. A drop in users negatively affects ArcSoft financially, but this is difficult to quantify.

5. In another development since ArcSoft filed [its motion for preliminary injunction], ArcSoft commenced in-depth discussions with a major cosmetics company to enter into a partnership to implement looks sponsored by said company in our Perfect365 app. ArcSoft is not able to disclose the name of the company as this information is confidential. Despite the initial discussions, the cosmetics company ultimately elected to use another selfie editing and beautification app for its sponsored looks. ArcSoft has learned that it was the YouCam Makeup app, which is provided and used in conjunction with the YouCam Perfect app, that the cosmetics company decided to use in this regard. It is very difficult to quantify the value of not concluding a partnership with the cosmetics company which ArcSoft is now missing out on as a result of the cosmetics company's decision to use the infringing YouCam Makeup / YouCam Perfect app. Such partnerships not only provide advertising revenue, but also add to ArcSoft's overall positive reputation and goodwill in its Perfect365 app.

Leung Decl. ¶¶ 3-5 (Dkt. No. 52).[9]

Despite ArcSoft's submission of its reply brief and the Leung declaration, the evidence on record remains insufficient to establish a likelihood of irreparable harm flowing from defendants' alleged trademark infringement and unfair competition. Hsu's statements regarding the decrease in downloads and users of the Perfect365 app, and the lost advertising sales, are far too vague and unsubstantiated to materially contribute to ArcSoft's showing of irreparable harm. *See* Hsu Decl. ¶ 15. Leung's statements regarding the decrease in Perfect365 app users since around the start of 2015, when Perfect California was first incorporated, add some detail to ArcSoft's "decreased and diverted customers/users" theory. The statements still fall short of establishing irreparable harm, however, because the link between the decrease in Perfect365 app users and defendants' alleged

---

[9] Defendants contend that the Leung declaration should be struck because it is not proper rebuttal evidence. Dkt. No. 53. In the alternative, defendants request an opportunity to respond to the declaration in a supplemental brief. *Id.* They also object to the declaration on several evidentiary grounds. *Id.* While I will not strike the declaration, for the reasons stated below the declaration does not establish a likelihood of irreparable harm. Defendants' evidentiary objections to the Leung declaration, and to several of the other declarations submitted by ArcSoft, *see* Dkt. Nos. 34-38, 53, are OVERRULED. *See Herb Reed*, 736 F.3d at 1250 n.5 ("Due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.").

1    trademark infringement and unfair competition remains utterly speculative.  *See Wells Fargo*,

2    2014 WL 4312021, at *11-13 (finding no irreparable harm where, "while [plaintiff] has shown

3    that it has lost business, it has not shown any connection between that lost business and

4    defendants' use of the [allegedly infringing mark]").  The only evidence ArcSoft identifies in

5    support of this connection is the timing of Perfect California's incorporation and its "increasingly

6    aggressive efforts to promote the competing YouCam Perfect selfie editing app."  Leung Decl. ¶ 3.

7    These facts do not support a reasonable inference that the number of Perfect365 app users has

8    been decreasing as a result of defendants' use of the Infringing Marks.[10]  Moreover, ArcSoft fails

9    to offer any persuasive explanation of how the decreases in downloads, users, and advertising

10   sales are not properly characterized as economic injuries that can be remedied by monetary

11   damages.  *See Rent-A-Ctr.*, 944 F.2d at 603; *see also Wells Fargo*, 2014 WL 4312021, at *13

12   ("[E]ven if [plaintiff] were able to attribute any lost business to defendants' alleged trademark

13   infringement, false affiliation, and/or false advertising, [plaintiff] has not shown that such harm

14   could not be remedied through monetary damages.").

15          Similarly, Leung's description of the lost partnership with the cosmetics company is not

16   persuasive evidence of irreparable harm.  The lost partnership does not appear to have anything to

17   do with defendants' alleged trademark infringement or unfair competition.  ArcSoft does not

18   assert, much less show, that the cosmetics company elected to use the YouCam Makeup/Perfect

19   app over the Perfect365 app because of defendants' use of the Infringing Marks, e.g., because the

20   cosmetics company was confused about the source of the apps.  Indeed, it is incredible that this

21   could have been a basis for the cosmetic company's decision.  If anything, Leung's description of

22   the lost partnership undercuts ArcSoft's "decreased and diverted customers/users" theory.  It

23   provides an example of an entity, very likely recognizing the distinction between the Perfect365

24

25   _____

26   [10] This connection is important, among other reasons, because the preliminary injunction ArcSoft seeks on the basis of its trademark infringement and unfair competition claims is limited to enjoining defendants from using the Infringing Marks, or other marks that "so resemble the Perfect 365 Mark as to be likely to cause confusion."  *See* Mot. for Prelim. Inj. at 2.  To the extent that ArcSoft's downloads, users, and advertising sales have been decreasing for reasons other than defendants' use of the Infringing Marks, the requested injunction is not likely to address the problem.

27

28

United States District Court
Northern District of California

app and the YouCam Makeup/Perfect app, nonetheless picking the latter over the former.  That is what happens when products compete.[11]

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is GRANTED, and Arcsoft's motion for preliminary injunction is DENIED.  As stated at the hearing, ArcSoft shall file its amended complaint within 30 days of December 16, 2015.

Defendants' administrative motion to file under seal, Dkt. No. 41, is GRANTED.

**IT IS SO ORDERED**.

Dated: December 28, 2015

_____
WILLIAM H. ORRICK
United States District Judge

---

[11] Defendants also contend that the approximately 18-month delay between their first use of the Infringing Marks and ArcSoft's filing of its motion for preliminary injunction undercuts ArcSoft's claim of irreparable harm.  *See* Opp. to Mot. for Prelim. Inj. at 2, 24; *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  Because ArcSoft credibly argues that it acted diligently once it believed that defendants' conduct threatened to cause it irreparable harm, I do not rest my decision on its delay.  However, I note that ArcSoft's counsel's statement at oral argument that "there is no evidence in the record" that ArcSoft was aware of defendants' alleged infringement until July 2015 distorts the record.  While there is no evidence in the record *confirming* that ArcSoft was aware of defendant's use of the infringing marks before July 2015, nor is there any declaration or other statement from ArcSoft denying that this was the case.  The evidence that is in the record overwhelmingly indicates that ArcSoft knew or should have known of defendants' use of the Infringing Marks before July 2015.  ArcSoft specifically alleges that Cyberlink filed an application on the YouPerfect Mark on November 20, 2013 and registered the mark on March 31, 2015.  Compl. ¶¶ 31-32.  Perfect Cayman Islands filed an application on the standard character mark "PERFECT" on May 15, 2015, and another application on a design mark on the wording "PERFECT" combined with a particular design on May 22, 2015.  *Id.* ¶¶ 37-38.  Moreover, ArcSoft repeatedly emphasizes that "[t]he parties' marketing channels are literally identical," and that their respective apps are immediately adjacent in the Google Play app store.  Reply ISO Mot. for Prelim. Inj. at 1-2; *see also* Mot. for Prelim. Inj. at 6 ("The consumers of the parties' respective apps are the same, and said consumers are encountering the apps in the marketplace at the same time and place.").